Good morning, counsel. Good morning. And if it may please the court, my name is Gus Flangus and I'm representing the appellant Ignite International Brands, Inc., which we've referred to as brand throughout the paperwork. Also with me today is Kimberly Stein. She's representing the other appellant, which is Ignite Spirits, Inc., which we've referred to as spirits throughout the paperwork. All right, counsel, it's my understanding that you all will divide the time, 10 minutes and 10 minutes. Well, Your Honor, what we've decided, if this is okay with the court, because a lot of the arguments are very similar for both parties, I will handle the bulk of it. Ms. Stein will be here to answer any specific questions that you might have pertaining to our client. We've got 20 minutes total. That's correct. So when the time is gone, if you use it all, then we don't get to hear from Ms. Stein. That's correct, Your Honor. We accept that. And then I'd also look at trying to reserve about five minutes at least for rebuttal. We'll see. All right. Thank you, Your Honor. Okay. First of all, this is a comment to the court because of a motion for a summary judgment that was granted by the district court against the two appellants. The motion was wrong on many level. Excuse me. The granting of the summary judgment was wrong on many levels. One, this entire case is replete with genuine issues of material fact. And the first thing I want to address is it pertains to my client. Somehow the district court found my client liable as a matter of law for a breach of contract on a contract which my client wasn't even a signatory to. Joined severally liable. In addition to that, with all the causes of my client, those were all dismissed with prejudice. They're not part of this appeal. So we're here dealing with a breach of contract action. Now, how the lower court found that my client was a signatory to the client is a little bit tortured. First of all, my client, again, was not a signatory to the agreement. And the agreement we are referring to is a letter agreement. I'm sorry to interrupt, but just before you get into the merits of that, what is the, so this is a question of contract interpretation, right? The court read the contract to make you a party to it, and you say you're not a party to it. What is the standard of review that we apply to that determination? De novo, I believe, is the standard of review. You're looking at this as though you're hearing it for the first time on a motion for summary judgment. And what was the standard that the district court was supposed to apply? I mean, is contract interpretation is a question of law? Contract interpretation, yes, is a question of law. But there are other factors that sometimes factor into. Under Nevada law, that's generally, you're right, Your Honor, it is a question of law, but sometimes there's other factors that factor into the interpretation that may require a finder of fact to get to it. And this is what I'm going to get into right now as far as what it goes pertaining to this contract. The question of who was a party to the contract, is that a question of law? I don't believe that's a question of law at all, Your Honor. I think that's clearly a question of fact, and I will address that now. And so, you're saying there was a material issue of fact raised regarding who was a party to the contract? That's correct, Your Honor, because the contract itself states that the contract is between IGNITE, and that's Spirits, and AR Consulting. And again, the agreement we're talking about is a letter agreement dated March 11, 2021, for clarity. That agreement states in the heading who the parties to that contract are. That's clear interpretation. There's no other parties listed. Now, the court said in its order that there was references to IGNITE throughout the contract, and that somehow we can find that the brands is a party to that contract. But let's look at what it says in the contract. In the heading of the contract, it says it's between, like I said, Consulting by AR and IGNITE Spirits, and then it has a defining term next to IGNITE Spirits, Inc. as being IGNITE. So everywhere in that contract you look where it says IGNITE, that is a defined term. But maybe not quite everywhere, because when you get to the compensation provision, it says that AR is going to be compensated by the issuance of, it says IGNITE Shares, but there it means IGNITE Brands Shares, right? If you look at that compensation portion, Your Honor, it says IGNITE Brands, their shares, and then it has a defining term as IGNITE Shares. We do those in contracts because you don't want to be spelling out IGNITE International Brands, Inc.'s shares everywhere in the contract. So you put defining terms, and it is a defined term. The only other places that IGNITE Brands appears is in Exhibit B and Exhibit C to the letter agreement, and those are separate agreements. Those are option agreements to buy shares in IGNITE Brands. But if IGNITE Brands was not a party to the LOI, or the letter agreement, how did it have an obligation to issue shares to AR? The obligation pursuant to the contract fell on spirits to deliver those shares. That was their obligation. And furthermore, I will point out that throughout this entire thing, consulting by AR is represented by counsel, and counsel should have, if that was a worry for them at the time, should have put in there a separate agreement between brands and AR consulting. And the reason they should have done it would have been like a guarantee. Sometimes we have contracts where it's between person A, person B. Person C is not a part of that contract, but they guarantee performance of that contract, usually in the form of payment. Of course, that didn't happen. Furthermore, I'll point out that this is a fact that was overlooked by the District Court. Prior to this letter agreement being signed, there was a draft. The draft had brands as a party and a signature block for brands. And that was taken out. So that's clearly an indication that it wasn't there. But do you agree that John Schaefer had authority to enter contracts on behalf of... I'm sorry, I couldn't hear you. Did John Schaefer have authority to enter contracts on behalf of IGNITE International Brands? He had authority to enter into this contract with spirits. And you could make the argument he could have the authority to enter in on behalf of brands because he was a president of that company as well. Which leads me into my next point. The Judge Mahan, excuse me, below found also that they were party to the contract because there was common management between the two entities. And if you look at that, it's completely ignoring corporate formality. Because we got companies all over the state, country, where you've got several subsidiaries and you've got common management. But you still have separate entities. Each corporation is its own entity. The brands is the parent corporation to spirits and just because they're the parent doesn't make them liable on that contract. The bottom line is they're ignoring, the Judge below ignored corporate formality on this. The thing that's really important to point out here is you could somehow try to peg liability on brands if this was the case, if the facts supported it, with an alter ego claim. Or, you know, piercing the corporate veil. That never happened below. It wasn't, it wasn't played and so therefore it wasn't before the court. So therefore, there's no way, you know, there's clearly all kinds of issues of fact on whether or not my client was a party to that agreement. Any more questions on that? I apologize. Going into the next part here, to find my client liable on that contract, you have to find that there was a breach of that contract by spirits. And there wasn't a breach of the contract by spirits. In fact, there was a contract had a very clear contractual provision that consulting by AR was required to deliver a definitive agreement with Resort Worlds prior or on July 1st of 2021. Let me ask you a question. So even if time is of the essence, even if there, if there was a provision in the contract, time is of the essence provision. Can a party who fails to perform by specified date still enforce the contract if their performance was delayed? Let me, let me give you an example. So if AR had submitted the contract a month before the deadline and Ignite just sat on the contract and refused to sign it, how could, how could you argue that that is a material breach by the party who's done all the things that they need to do, have turned the contract over for signature? And then here we're talking about a day, but I'm not sure it matters whether it's a day or two weeks or two months. That would be an issue of fact, Your Honor. And the reason is the issue of fact is whether or not my client... Is it disputed that the contract was submitted to Ignite for signature and that it wasn't signed until the day after the deadline? It was signed the day after, but what we don't have... But that's not a disputed fact, correct? But what we don't have right now is... Answer my question. I'm sorry. That is not a disputed fact. It is a disputed fact, Your Honor. It's a disputed fact that the signature didn't come until the day after the deadline? It came on the day, Your Honor, of the deadline. And it wasn't a, it wasn't, that's a disputed fact. It came on the day of the deadline. And I also point out... Can we go by the date that's put on the contract? Well, if I can, Your Honor. Well, but just to answer that, do we look at the date it was signed as the date that's indicated in the signature block on the contract? That's correct, Your Honor, because that's what the contractual term calls for. So if I can get this out, what I'll tell you is that that agreement wasn't provided until early part of June to my clients. And then as late as June 29th, the Resorts World was still working on a contract. But what does it matter if it was submitted and then held? I think the point that I'd like you to address here is this idea that somehow the time is of the essence provision, assuming that we find that there is one, is a sort of dispositive issue given the facts that Ignite could have held the contract for any amount of time without performing. That's a possibility, yes. They have heard from the respondent on this is a bare allegation that they sat on their hands. And you can't, that's a bare allegation. You know, what's really illustrative of this is there wasn't a single deposition or declaration, affidavit or anything from anybody from Resorts World. We just have an allegation that my client's, or excuse me, Mr. Stein's client sat on its hands on this. And that's all we have. And so that becomes an issue of fact on whether they sat on their hands on this. It's clearly an issue of fact. But the contract does not have a time is of the essence provision. No, it doesn't, Your Honor. And doesn't, didn't, I thought under Nevada law, unless you have an express statement to that effect or the circumstances create that necessary implication, we don't read one in, do we? Well, that is partially correct, Your Honor. What it says under Nevada law, this is Mayfield versus Karorgi, 124 Nevada, 343 Pennsite, 349. If time is not of the essence, the parties generally must perform under the contract within a reasonable time, which depends on the nature of the contract and the particular circumstances involved. So let me, if I may, Your Honor. So what we have here is we don't have a time of the essence clause. And time of the essence clauses usually go into what we call miscellaneous provisions on most of the contracts in Nevada that I've dealt with. And it's supposed to cover all. But in this case, we've got something stronger and more powerful than a time of the essence clause. So under subsection one, excuse me, section one of the letter agreement, if the portion right here, and bear with me on it, it says CIR, which is consulting by AR, shall be entitled to the compensation set forth in section two below in the event IGNITE executes not later than July 1st, 2021, a definitive agreement with Resorts Worlds acceptable to IGNITE in its sole and absolute discretion, which contains substantially all the terms and conditions detailed in Exhibit A attached here too. If that's all it said, I think I wouldn't be up here trying to push this forward because we don't have a time of the essence clause. And I would concede the issue. But if you read on there, this is what it says further. This is a specific contractual term. In the event the Resorts World agreement is not fully executed by July 1st, 2021, IGNITE shall have no obligation to compensate C-AR or to reimburse C-AR for any costs or expenses. Furthermore, the AR consulting recognized this the day of, on June 30th, the day before this contract's done, and they sent an email to our clients asking for an extension of this date. So they knew this was a material term. But when you read it in context, and it seems fairly clear from the agreement that the point was they wanted the agreement in place that they could have the launch party. And the launch party happened as scheduled and everything was set up for the launch party. So it's hard to see why the date matters in terms of anything that the parties cared about when they were drafting this. Because there were more things involved in the launch party. Because we're dealing now with kiosk. We're dealing with putting these things in the room, the product of IGNITE, which requires ordering product, getting it there on time, so that it can be launched with the launch party and that it can go in the rooms in the kiosk. I mean, you don't just say, hey, I'm entering the contract. Here's 500,000 units of vodka or whatever the case may be. It takes time to get it there. And so that's why it was important to have that agreement signed on that date. And then lastly, I'll address really quickly the damage issues. The compensation on this was supposed to be the issuance of restricted stock belonging to brands. And Judge Mahan instead awarded a cash amount. And it didn't call for cash. There was no cash to be paid to these folks. The idea was for them to receive shares in stock. And it's kind of like this is attorneys doing things on a contingency basis. You know, they felt that if this agreement came through, this stock was going to go through the roof. Because of other problems with the agreement, the stock didn't go through the roof. But it was still about getting an issuance of these shares. Problem is, the issuance date is not the same as when the Canadian securities officials would need to approve it. That would really be the issuance date, because you can't issue it until there's an approval. And then the valuation would have to be on the time that these things are sold, not when they were handed to them. So you just don't take $2 million of Canadian, convert it into American based on July 2, 2021. If there's no further questions, I'd like to reserve the remainder of my time for rebuttal. Of course. Thank you. We'll hear from opposing counsel. Thank you, Your Honor. May it please the court. In listening to the question, please introduce yourself. Oh, I'm sorry. Jason Wiley, the law firm Wiley Peterson. Along with me is Daniel Kidd of my firm and Alan Richardson, who is the proprietor and principal of Consulting by AR. May it please the court. Yes. Good morning. Based upon the questions that I heard from the court, you guys get it. And the district court got it as well. And the issues that were raised in the moving papers... Counsel, could you please stay close to the microphones? We're... Understood, Your Honor. ... broadcasting this, so we need clear audio. And I'd like to address some of the issues that were raised by opposing counsel in his remarks. But first, the reason why we're here is pretty clear. And that is that the IGNITE parties believe that they found a loophole in order to avoid paying compensation in the amount of $2 million Canadian to my client. The record is devoid of any communications, documents, emails, any sort of correspondence whatsoever after the IGNITE parties received the definitive agreement on June 29th of 2021 as to why that agreement was not executed either on the 29th, either on the 30th, or on July 1st. Instead, they wait until July 2nd, where they believe the expiration of this deadline occurred, and execution occurs at 924 in the morning. It's pretty clear, it's pretty unequivocal why they did that. And that's simply because they thought that the expiration of 10 hours, had that agreement been signed 10 hours before, then consulting by AR would have gotten their compensation in their mind. But they thought they could sit on it and avoid that obligation whatsoever. And all we have in the record from June 29th to July 2nd is the passage of time. Counsel did address Mr. Richardson's email, where he indicated, do we need an extension? What's going on? Is there any issue with the bond? Did they say anything? Did they respond to that email? They did not. Again, they sat on the issue. They wanted this date to pass, and they thought that that would avoid a $2 million Canadian obligation. Counsel, could you address opposing counsel's argument that IGNITE Brands was not a party to Absolutely, Your Honor. And I would direct the court to Exhibit B of the letter agreement. And that's the form of option agreement. That's SER 766. The express language, and if I may, I will read it. And again, this document is form of option agreement, has to do with the option consulting AR could have exercised. When interpreting the terms and conditions of this option agreement, reference should also be made to a letter agreement between the optionee, as defined by consulting by AR, and the company, dated March 11th, 2021, herein referred to as the as IGNITE International Brands LTD, the company. And that excerpt indicates the option agreement, the agreement defined, is entered into between IGNITE International Brands LTD, the company, and the optionee named below, pursuant to the company's stock option plan. So the literal language of the form of option agreement indicates that the company, Brands, entered into the letter agreement dated March 11th, 2021. This document is initialed. This document is on IGNITE letterhead. This is their document. This is their form. Also, issue was raised regarding the signature block. It is clear, and it's unequivocal, that John Schaefer was the president of both Spirits and Brand. The record reflects that he had the authority and the power to bind both of the companies. Also, the course of performance that occurred thereafter, as indicated in the record, indicate the generic use of IGNITE throughout, and that there is no delineation between the letter agreement being between Spirits only. In Mr. Schaefer's email from July 20th of 2021, now this is 18 days after the execution of the agreement, Mr. Schaefer writes, I spoke to Paul and David Bell about this, and they have both agreed IGNITE should honor the deal made with you based upon this feedback. IGNITE should honor the deal. IGNITE should pay the shares. That's Brands and Spirits. Paul Bilzerian's email from April 2021 to consulting by AR's counsel, and I quote, Paul Holden forwarded your email to me, so that there are no misunderstandings pursuant to the letter agreement dated March 11th, 2021, between consulting by AR and IGNITE, your client will have earned nothing until a definitive agreement between IGNITE and Resorts World is signed. What do we do, though, about the very first sentence of the letter agreement? I mean, in a way that includes Spirits, but not Brands. I mean, doesn't that at least create an ambiguity? That document and that paragraph alone potentially could cause an ambiguity, but the fact that form B indicates that Brands, the company entered into the letter agreement, erases that ambiguity altogether. The signature block issue that was raised by counsel, indicating that a prior iteration of the letter agreement included a signature block denoting Brands and a signature block denoting Spirits, does not work in their favor. It's to the contrary. The parties realized that's Milton Suspenders. We don't need two separate blocks. Instead, all we have to do is put John Schaefer's name there as president. He's the president of both. But again, any ambiguity is totally erased based upon the literal language set forth in Exhibit B. With respect to the damages that were raised, counsel indicated that the damages that should have been provided were the shares, sort of akin to a specific performance argument. That is not a correct conclusion of Nevada law. Under Nevada law, in the Turley v. Thomas case, which is 31 Nevada 181, the holding from the Nevada Supreme Court states, a court in Nevada is not required to order specific performance in a contract case where a material breach has occurred. The decision to grant specific performance lies within the discretion of the court, which will consider whether the breach can be adequately compensated by damages. If damages are sufficient, the remedy at law is preferred and specific performance will not be ordered. So the court had the discretion to make a determination as to what the damages in this instance should be. And that goes back to consulting by A.R.'s counterclaims, wherein under the breach of contract, the prayer for relief asked for both specific damages or monetary damages. The court, exercising its discretion, made the determination that monetary damages were proper. The court calculated those damages from July 2, 2021, which was the date of the execution of the definitive agreements, because according to the express language of the letter agreement, consulting by A.R. was entitled to that compensation simultaneously at the time of the resort's world agreement being fully executed. So the court did not err in determining the breach occurred as of July 2, 2021. The court did not err in awarding monetary damages, and the court did not err in converting a $2 million valuation of Canadian dollars into United States dollars of $1.611 million. So I was curious about the second clause under 2, which was the option to purchase shares. Did you seek damages for, presumably one could calculate that the option had some value, presumably less than $2 million, but there's some value for the option. Did you seek damages based on that? Consulting by A.R. never saw damages under the option agreement. It was pretty clear that once the breach occurred, the damages were limited to the $2 million initially to be provided simultaneously. The district court, in its order, made the correct determination regarding the materiality aspect of the contract. There, the district court held that execution of the final definitive agreement one day after the deadline was not a material breach. And in this instance, that is correct. Is that true even if we were to read in or assume that the language constitutes a time as of the requirement? I'm sorry. So if we were to find that there is a time as of the essence provision in this contract, wouldn't the late signing of the contract be a per se material breach? It would not. And here's why. What's your best case to, in support of your position, that A.R. still has not materially breached the agreement? It's the BZ Clarity Tent sub case that was cited in our moving papers. Materiality generally depends on whether the provision induced the party to enter it, goes to the substance of the contract, or affects an essential purpose of the contract. Now here... So counsel, just so I understand your argument, you said, you're saying even if time is of the essence, do we still have to look at materiality of the breach? You do. And here's why. First of all, without beating a dead horse, consulting by A.R. did everything that was required of it pursuant to the letter agreement. There was no other obligations that it had to provide in late June, in our time frame when the IGNITE parties had the agreement on their desk and refused to sign it for whatever reason. Now the District Court made their determination in their order that the purpose of the letter agreement was for consulting by A.R. to negotiate terms of a definitive agreement between Resorts World and IGNITE. Okay? That was accomplished. Yeah, this fact is to me particularly relevant and something that I find interesting is that none of the briefs cited a Supreme Court of Nevada case, NGA number two limited, which I think goes precisely to this point, which is even if there is a time is of the essence provision, if we have a circumstance where there's nothing more that your client can do, it's turned over the contract, it seems that you can't then cite to that, you know, provision, which of course we don't even have on the face of this contract, but if we were to read one into it, to be able to say that that constitutes a per se breach by your client. So, you know, again, I hate to ask you about a case that you haven't cited, but I think that that principle is well established under Nevada law. And I would agree. Absolutely. And again, the materiality aspect of it here is that even if time was of the essence, okay, the fact of the matter was that the IGNITE parties sat on the agreement, and there's nothing in the record that indicates why they did that. But also taking the totality of the circumstances, here time isn't of the essence in any way. The underlying obligations of Resorts World and the IGNITE parties were not changed whether or not the agreement was executed on June 28th, June 29th, June 30th, July 1st, July 2nd, July 3rd, July 4th. It didn't change those underlying obligations. Time may have been the essence. Let's assume on a hypothetical that, say IGNITE wanted to have Independence Day product put in Resorts World. And obviously with Independence Day being July 4th, sure, the definitive agreement had to have been executed at that time in order for that Independence Day product to be highly marketable right around the 4th of July. If the agreement was executed July 10th, well, you're not going to keep that Independence Day product for 360 days and hope to sell it the next year. But we don't have that here. We don't have that here. And more importantly too, what we have is we have performance by the parties of the definitive terms and conditions in that definitive agreement between Resorts World and IGNITE. The July 1st target date was always hinged on the Resorts World grand opening, which at the time was scheduled for July 4th, 2021. Resorts World moved that up to June 24th of 2021 and the parties both performed their obligations required of them pursuant to that definitive agreement. IGNITE representatives appeared, posted on social media regarding Resorts World and the grand opening. Resorts World had IGNITE product. Any of the final revisions during the period of time from June 24th to June 29th were minor at best. Mr. Flyingus referred to the movement of a kiosk, where a kiosk was going to be located. Well, that's not material in any way. That's kind of ancillary. That's not the purpose of the agreement. So again, using the adage, if it quacks like a duck and it waddles like a duck, it's probably a duck. We had a definitive agreement as of June 24th. With respect to the waiver agreement that was raised in the moving papers, the district court correctly determined that IGNITE waived any dissatisfaction argument as indicated in the letter agreement. It says that consulting by AR shall be entitled to compensation set forth in section two below in the event IGNITE executes not later than July 1st, 2021, a definitive agreement with Resort World acceptable to IGNITE in its sole and absolute discretion, which contains substantially all terms and conditions detailed in Exhibit A attached here too. IGNITE tries to raise the issue of, well, there's a creation of a genuine issue of material facts because IGNITE in their sole discretion could have made a determination as to whether or not the definitive agreement was acceptable. Fair point. But there's nothing in the record at any time indicating IGNITE's dissatisfaction with the definitive agreement, any dissatisfaction with consulting by AR, or dissatisfaction with the terms and conditions of any of the underlying agreements. And in fact, it's just the opposite. IGNITE representative Paul Bilzerian sends an email in June of 2021, approximately 20 days before the execution of the definitive agreement. And I quote, I continue to receive positive reports regarding consulting by AR and your efforts to help IGNITE. I thank you for that. He goes on to further state a very mutually enjoyable and beneficial relationship between IGNITE and ResortsWorld has developed. I am sure you, meaning consulting by AR, had much to do with that. And again, let's refer to Mr. Schaefer's email post-execution of the definitive agreement where he states, it is clear that ResortsWorld plans to honor their agreement with IGNITE and will continue to work with us as strong brand partners. I spoke to Paul and David Abell about this, and they have both agreed IGNITE should honor the deal made with you based upon this feedback. So even after execution of the definitive agreements, there's satisfaction. The IGNITE parties commence litigation on a very narrow declaratory relief clause of action. They want the court and the trier fact to look at just the four corners of the agreement that includes that July 1st deadline date without anything more. So counsel, you have 35 seconds. If there's something you want us to know, you should say it now. Understood. I think I've hit all the high points. Unless any of the honors have any questions, we would just request that the court affirm the judgment entered by the district court, as there are no genuine issues of material fact, and the district court's decision granting Consulting by AAR's motion for summary judgment for its breach of contract cause of action against IGNITE brands and IGNITE spirits was not erroneous. Thank you. Thank you, Your Honor. The first thing I want to point out is that this motion for summary judgment was granted without any oral argument. And as you heard from the presentation by my fellow counsel, this case is replete with issues of fact. He's got all these facts coming at us on why Judge Mahan did what he did. If you look at it, Judge Mahan was weighing credibility of folks. First of all, the letter that he said that was sent by Paul Bilzerian in June was actually sent in early March, March 2021. And that's SCR 629. In fact, Mr. Bilzerian said another email on January 11, 2021, which is SCR 585-86. And it's mentioned in their brief on page 24, where he wasn't real happy with the terms as they were coming together. Because what Mr. Bilzerian was saying is we're trying to get a return on a lot of money. That's why we're going to give you all this stock. And you got to deliver the agreement the way we said it needs to be and it's not coming that way. Before you run out of time, could you address Exhibit B to the letter agreement? Because I mean, you know what it says, but it seems like that just doesn't really make any sense unless Brands is a party to the agreement. Well, it does make sense of the honor. First of all, you got to look, the court's only allowed to go to the four corners of the document itself. The document is the basic letter agreement. This is an option agreement that's added to the agreement. It was part of the agreement when the agreement was signed. I don't think it really is a part of the agreement because it's just to enforce a term of the agreement, which is B of the compensation there, which that option agreement gives them a right to purchase shares in Brands. Right. But I mean, it's referenced in the agreement, right? And because I don't really want to, I'm going to split hairs here, if you'll excuse me, where it says company, there's no defined term for company. And then as you go down below it, there is a defined term for company. And in that case, the company on that option agreement is Brands. And so it wasn't a defined agreement up there. They're just referring to the company, which would have been spirits of the main agreement, because there's nothing in the main agreement that says Brands is a signatory to this contract. Nothing. And there's defined terms throughout all these documents. I would also add that Exhibit B wasn't signed by Brands either. It's just put on there. And so I think it's distinguishable on those bases right here. Again, it becomes a question of fact. What is the purpose here? And they're trying to, you know, Judge May and below try to extrapolate from all this, say there's no issue of fact because I've got these things and, you know, all these different factors here. And those factors don't correlate with the plain language of the agreement. And if we look beyond the agreement and its exhibits, the facts that we would look at would be the removal of the signature block. And then I suppose they point to the sort of relationship with the two companies. Is there other evidence that would be relevant to whether there's a factual dispute? Exactly, Your Honor. That's one big factor. I don't know how he says that's not an important factor. It is because if you're going to put Brands as a obligor on that contract and you take that signature block off, that's a huge factor. But the main factor, Your Honor, is what's defined in the contract is the parties. Because here's... But you're not... I just want to be clear. You're not saying that there's some other evidence other than what I just mentioned that would give rise to a factual dispute. The factual dispute is that signature block. The fact is that there's nothing in that agreement that says Brands is a party to that agreement. In fact, if you take Judge Mahan's ruling on this, you're going to set contract law on its head in the state because how can you rely on the heading that says who the parties to the contract are? If, you know, if you've got the headings up here and says contract between A and B, oh, I'm going to bring C over here and make him liable without some form of... Now, if it was an indemnification claim and you're trying to do that based on, you know, the corporate, excuse me, on piercing the veil or an alter ego theory, I can see it. But here, we don't have it. I think my time's out unless you want me to answer any further questions. Are you satisfied with the answer? All right. Thank you, counsel. Thank you very much. Thank you to both counsel for your helpful arguments. The case just argued is submitted for decision by the court.
judges: RAWLINSON, MILLER, DESAI